## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **KELLY GAINOR,** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | |
| | **:** | **Case No. 2:11-CV-561** |
| **v.** | **:** | |
| | **:** | **JUDGE ALGENON L. MARBLEY** |
| **WORTHINGTON CITY** | **:** | |
| **SCHOOLS, et al.,** | **:** | **Magistrate Judge Abel** |
| | **:** | |
| **Defendants.** | **:** | |

## OPINION AND ORDER

## I. INTRODUCTION

This matter is before the Court on the Defendants' Motion for Summary Judgment. Plaintiff, through her Complaint and Response in Opposition, brings the claims of Retaliatory Conduct pursuant to the ADA, the Rehabilitation Act, the IDEA, O.R.C. § 4112 "and other Ohio and Federal common and statutory law," and Intentional Infliction of Emotional Distress. For the reasons set forth herein, Defendants' motion is **GRANTED**.

## II. BACKGROUND

### A. *Factual Background*

Kelly Gainor ("Gainor" or "Plaintiff") brings this action against Worthington City Schools and Worthington School District Human Resources Director, Jeanne Paliotto ("Paliotto"), (collectively "Defendants") for alleged violations of the Americans with Disabilities Act, the Rehabilitation Act, and the Ohio Revised Code, as well as for intentional infliction of emotional distress, stemming from Gainor's employment in the Worthington School District ("WSD" or the "District").

1

Gainor began working in the District in 2003.  After working in the food service department for one year, Gainor moved into a position as a teaching assistant at Bluffsview Elementary School, where she remained until 2008.  During the 2007-2008 school year, Gainor, whose autistic son is a student in the District, became increasingly concerned about her son's Individual Education Program ("IEP").  On April 22, 2008, Gainor filed the first of approximately six complaints regarding her son's IEP with the Ohio Department of Education ("ODE").[1]  Human Resources Assistant Teresa Gresh ("Gresh"), Paliotto's assistant, was aware of the filings, and provided the relevant paperwork to Paliotto.

Following a meeting with her son's IEP team on October 20, 2008, Gainor filed another complaint with the ODE on November 4, 2008.  In response to Gainor's complaints, and the complaints of other parents similarly affected, the ODE conducted an audit and investigation of the District.  Paliotto was not involved in the investigation.  The investigation resulted in corrective action through relevant District training.

At the beginning of the 2008-2009 school year, Gainor started a new job as a special education assistant at Worthington Kilbourne High School ("WKHS").  This was a position for which Gainor applied, interviewed, and subsequently accepted, with the knowledge that it involved a Behavior Learning Center ("BLC").[2]  At WKHS, Gainor reported to Assistant Principal Ken Nally ("Nally").  Nally was aware that Gainor had two sons in the school district, but did not, as Plaintiff alleges, know about her son's autism.[3]  As early as one week into

---

[1] When asked about the number of complaints filed with the ODE regarding her son's IEP, Gainor replied, "At the time there might have been tow, there might have been more…I'm not sure. I've filed numerous…. I think I may have filed six, five or six."  (*Gainor Dep.*, Doc. 18 at 224-25).
[2] Based on the information provided by the parties, it seems that a BLC encompasses students with various levels of behavioral issues, ranging from mild to more aggressive behaviors such as hitting, biting, etc.
[3] In his deposition, Nally first stated that Gainor told him that her son was autistic during her interview for the WKHS position, but immediately backtracks, stating, "I know that she did have experience with special education in her work history, and I don't know whether she said that her son had autism or not. I can't recall."  (*Nally Dep.*, Doc. 19-12 at 75).

Gainor's employment at WKHS, Nally was made aware of the ODE filing by the Department Chair for Special Education, Ellen Clark ("Clark").  According to Nally, Clark was particularly nervous about the data sheets Gainor was keeping for the intervention specialists in the department to collect behavioral information.  Nally also spoke with the Director of Special Education, Lynne Hamelberg, regarding Gainor's ODE filings and related actions.

During that school year, Nally disciplined Gainor for various issues.  Nally asked Gainor not to speak to a specific parent during the school hours.  Gainor alleges that Nally asked her not to speak to parents of special education students, in general, while Nally contends that his request was limited to the particular parent involved in the relevant discussion with Gainor.  In addition, Nally, per Gainor's request,[4] investigated the claim that WKHS had directed students to monitor Gainor and to report on her behavior.  On January 13, 2009, Gainor got into an altercation with one of her students, allegedly calling her a "fucking retard," and telling her to "drop out of school."  Following an investigation, Nally decided that Gainor had not called the student a "fucking retard," and that Gainor's comment telling the student to drop out of school was taken out of context.

On February 12, 2009, the District conducted a disciplinary hearing with Gainor, which covered the following charges: 1) leaving work on January 15, 2009 at 12:30 p.m. without reporting off to her supervisor; 2) failing to perform her functions as a special education assistant due to Gainor's use of the classroom computer for personal matters; and 3) concern about Gainor's professional conduct, interaction with students, and choice of language.  On February 18, 2009, Gainor filed a harassment complaint with the District, stating that any and all

---

[4] Nally's deposition states that during one of her disciplinary hearings, Gainor asked that it be investigated, but later Nally does not clarify when counsel asks about his conversation with Paliotto regarding that investigation.  (*Nally Dep.* at 9, 70).  It may be the case that Paliotto directed the first investigation, and Gainor, during her disciplinary hearing, asked that the specific students be interviewed.

disciplinary actions taken against her were the result of retaliation for her ODE filings, speaking with local newspapers about her experience in the District, documenting incidents through the data sheets, and advocating for her son.  On March 3, 2009, Gainor received a letter from Paliotto, stating that as a result of the disciplinary hearing, Gainor would be suspended for one day.

On May 13, 2009, the District held a meeting with Gainor for the purpose of talking about her concerns and clarifying the District's expectations.  On September 17 2009,[5] the District conducted another disciplinary hearing, this time in regard to allegations of Gainor's insubordination and failure to follow work rules and procedures. As a result of this disciplinary hearing, Gainor was suspended without pay on October 12 and 13, 2009.  On October 6, 2009, the same day she received a letter from Paliotto with the disciplinary hearing's outcome, Gainor filed a complaint with the Ohio Civil Rights Commission ("OCRC"), checking the boxes marked disability, retaliation, and reasonable accommodation.

At the beginning of the 2009-2010 school year, the District transferred Gainor to Granby Elementary school to work in another BLC.  Gainor's new position required the same hours and provided the same pay as her job at WKHS.  Gainor believed that working in another BLC would be problematic,[6] and told Gresh that she could not accept the new position.  Paliotto subsequently offered Gainor a position at Worthington Kilbourne Middle School ("WKMS") as an intervention specialist, working at the same pay rate for seven hours a day, which Gainor accepted.  Following three instances of tardiness without notification, the District held a disciplinary hearing with Gainor, resulting in a letter of direction clarifying work rules and procedures.

---

[5] This hearing was originally scheduled for July 6, 2009.
[6] Gainor originally did not want the position because of her alleged disability, but has since dropped the claim. This is discussed further in section IV.

4

In May 2010, Gainor received notice that, due to budget cuts, lack of funds, and lower enrollment, her job might be in jeopardy.  The District maintained that they would notify her of any changes pursuant to the "bumping rights" in her Collective Bargaining Agreement.  On June 15,  2010, Gainor received notice that her position had, in fact, been eliminated, and that effective June 30, 2010, she was reassigned to the position of intervention specialist at Worthingway Middle School ("WMS") for the 2010-2011 school year.[7]  Her new position provided the same pay rate, but was six hours per day rather than seven.  Gainor did not file any grievance in response to her new position.  It is undisputed that such a position change is within the right of the District.

In June 2010, Gainor applied and interviewed for an instructional assistant position and an intervention assistant position.  In November 2010, she applied and interviewed for another instructional assistant position.  In March 2011, Gainor applied for two different summer school positions, a pre-school position and a special education assistant.  Though Gainor applied late, Gresh processed her application.  She did not receive either position, and is currently employed at WMS as an intervention specialist.

### B. Procedural History

Plaintiff filed this action on June 27, 2011, asserting the following claims against Defendants: (I) Disability Discrimination pursuant to the Americans with Disabilities Act ("ADA"), O.R.C. § 4112, and the Rehabilitation Act of 1973 ("RHA"); (II) Retaliatory Conduct pursuant to the ADA, the RHA, O.R.C. § 4112 "and other Ohio and Federal common and statutory law"; and (III) Intentional Infliction of Emotional Distress.  (*Compl.*, Doc. 1, 4-8.)

---

[7] Though none of the relevant documents say so, it seems that the intervention specialist position was a BLC position, which is why Gainor continued to look for other employment opportunities after receiving that job.

On December 28, 2012, Defendants moved for summary judgment on all claims. (Doc.

15.)  In her responsive briefing, Plaintiff conceded that "it does not appear that she was the

victim of disability discrimination" and, therefore, stated that she does not oppose Defendants'

motion to dismiss Count I of her complaint.  (Doc. 19 at 2.) Plaintiff does, however, oppose

Defendants' motion with respect to Counts II and III of her complaint.  In addition, Plaintiff

raised a new argument of retaliation under the Individuals with Disabilities Education Act

("IDEA").  (Doc. 19 at 10-11).

Based on Plaintiff's addition of the IDEA retaliation claim, Defendants requested leave to

file an amended motion for summary judgment, which the Court granted.  (Doc. 20; Doc. 23).

On October 4, 2013, Defendants again moved for summary judgment on Counts II and III.  (Doc.

24).  Oral argument was held, and this matter is, therefore, ripe for review.

### III. STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue of material fact and the movant

is entitled to judgment as a matter of law.  Fed.  R. Civ.  P.  56(c).  A fact is material if proof of

that fact would establish one of the elements of a claim and would affect the application of

governing law to the rights of the parties.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.

1984) (citing *Johnson v. Soulis, Wyo.*, 542 P.2d 867, 872 (1975)).

A movant for summary judgment meets its initial burden "by 'showing' – that is,

pointing out to the district court – that there is an absence of evidence to support the nonmoving

party's case." *Dixon v. Anderson*, 928 F.2d 212, 216 n. 5 (6th Cir. 1991) (citing *Celotex Corp. v.

Catrett*, 477 U.S. 317, 324-25 (1986)). At that point, the non-movant must set forth specific facts

showing that there is a genuine issue for trial.  *Id*. (quoting Fed.R.Civ.P. 56(e); *Anderson v.

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). It is not, however, the role of the trial court to "resolve factual disputes by weighing conflicting evidence because it is the jury's role to assess the probative value of the evidence." *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 230 (6th Cir. 1990) (citing *Stone v. William Beaumont Hosp.,* 782 F.2d 609, 615 n. 5 (6th Cir. 1986); *Kennett-Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980)). All evidence and reasonable inferences must be viewed in the light most favorable to the party opposing the motion. *Pucci*, 628 F.3d at 759 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## IV. LAW AND ANALYSIS

### A.  *Disability Discrimination and Harassment (Count I)*

In her response to Defendants' original motion for summary judgment, as well as her response to Defendants' amended motion for summary judgment, Plaintiff concedes this count. (Doc. 19 at 2; Doc. 25 at 2).  Due to Plaintiff's concession, Defendants argue that they are entitled to summary judgment on this claim.  (Doc. 24 at 9).  This Court agrees.  Therefore, Defendant's Motion for Summary Judgment on Count I is **GRANTED**.

### B.  *Retaliation (Count II)*

#### 1. Exhaustion of Remedies under Federal Law

Defendants argue that Plaintiff failed to bring her claims under the ADA, Civil Rights Act,[8] and RHA within the proper two-year statute of limitations.  (Doc. 24 at 10).  In response, Plaintiff states that she received her right-to-sue letter from the Equal Employment Opportunity

---

[8] Defendants include the Civil Rights Act, which is not mentioned in Plaintiff's Complaint, nor in her Response in Opposition.

Commission ("EEOC") "relative to her retaliation claim" on April 6, 2011, and properly filed suit within the applicable 90-day period.  (Doc. 25 at 18).  Plaintiff brings her claim of retaliation under the ADA, RHA, and ORC § 4112.

Plaintiff does not specifically identify, however, under which title of the ADA she brings her claim.  The Court, therefore, must infer the Title she intends based on the statute of limitations and exhaustion requirements she invokes.  As this Court has previously recognized, Title I, Title II, and Title III of the ADA each have different statutes of limitations.  *Bennett v. Bd. of Educ. of Washington Cnty. Joint Vocational Sch. Dist.*, No. 08-CV-663, 2010 WL 3910364, at *3 (S.D. Ohio Oct. 4, 2010).  A claim brought under Title II or Title III does not have an administrative-exhaustion requirement, and courts have used relevant state law to determine the proper statute of limitations for such claims.  *Id.* (citing *Bogovich v. Sandoval,* 189 F. 3d 999, 1002 (9th Cir. 1999); *McInerney v. Rensselaer Polytechnic Inst.*, 505 F.3d 135, 138 (2d Cir. 2007)).  Conversely, claims brought under Title I must meet an exhaustion requirement before any relevant claims are brought to court.[9]  *Id.*

Exhaustion of administrative remedies requires that a plaintiff: "file an EEOC charge within 180 days of the alleged unlawful employment practice or, if the plaintiff has instituted proceedings with a state or local agency, within 300 days.[10]  Once the EEOC dismisses the charge and issues a right-to-sue letter, the plaintiff has 90 days to file a civil action."  *Williams v. Nw. Airlines, Inc.*, 53 F. App'x 350, 352 (6th Cir. 2002) (citing 42 U.S.C. § 2000e-5; 42 U.S.C. §

---

[9] In *Bennett*, this Court noted: "This administrative-exhaustion requirement is the result of Title I's incorporation of 42 U.S.C. § 2000e—5, a provision of Title VII of the Civil Rights Act of 1964 which requires such administrative exhaustion."  *Bennett*, 2010 WL 3910364 at *3.

[10] The 300-day period starts to run when the employee "is aware or reasonably should be aware" of the allegedly unlawful employment action.  *Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 718 (N.D. Ohio 2008) (citing *Amini v. Oberlin College*, 259 F.3d 493, 498–99 (6th Cir.2001)).

2000e-5(f)(1)); *see also Granderson v. Univ. of Michigan*, 211 F. App'x 398, 401 (6th Cir. 2006).

As noted, Plaintiff cites the 90-day period in which to bring her suit under federal law, a requirement that is only mandated by Title I of the ADA. By implication, Plaintiff has acknowledged that her claim is brought under Title I of the ADA; therefore, her claim requires exhaustion. Similarly, the RHA requires exhaustion of administrative remedies: "Under section 1415(I) [of the IDEA], a plaintiff must exhaust applicable IDEA remedies as a prerequisite to bringing a [RHA] claim, even where plaintiff has no intention of bringing an IDEA claim." *B.H. v. Portage Pub. Sch. Bd. of Educ.*, No. 1:08-CV-293, 2009 WL 277051, at *3 (W.D. Mich. Feb. 2, 2009). Because exhaustion of administrative remedies is required for claims brought under the ADA and the RHA, the Court will address them simultaneously.[11]

In order to determine if Plaintiff has met the exhaustion requirement, the relevant facts must be applied to the exhaustion timeline. Gainor's first disciplinary hearing took place on February 12, 2009, and resulted in her March 3, 2009 one-day suspension without pay. On September 17, 2009, the District held another disciplinary hearing with Gainor, which resulted in her October 12 and 13, 2009 suspension without pay. Gainor filed her charge with the OCRC on October 6, 2009, which allegedly resulted in a right-to-sue letter received on April 6, 2011. Initially, it seems that Plaintiff may have validly exhausted her administrative remedies. She was first disciplined on March 3, 2009, and filed her OCRC charge on October 6, 2009. Since she instituted proceedings with the OCRC, a state agency, she had 300 days in which to file her claim. Gainor filed her OCRC claim within 217 days of the March 3 suspension, thereby falling within the 300-day time limit.

---

[11] An analysis of Plaintiff's claims brought under the IDEA is addressed on page 10, *infra*.

Though Plaintiff met the first part of the exhaustion requirement, she did not meet the right-to-sue letter requirement, as she has never produced the necessary letter. Plaintiff has had at least three opportunities to file the proper right-to-sue letter: (1) upon filing of her Response in Opposition (Doc. 19); (2) as part of the Motion for Leave to File EEOC Right to Sue Letter (Doc. 27).; (3) and in the Supplemental Memorandum Supporting Motion for Leave to File EEOC Right to Sue Letter (Doc. 29). Plaintiff filed a right-to-sue letter that is dated April 6, 2011, but, as Defendants accurately point out, the charge number listed on the October OCRC charge and the charge number listed on the EEOC right-to-sue letter are not the same, nor does Plaintiff give any indication that the charge numbers are related. (Doc. 25-4; Doc. 27-1). Furthermore, even if the documents are directly related, the Court has no way of knowing, as Plaintiff has failed to provide any documentary history linking the two forms. Thus, Plaintiff's failure to provide any evidence that her right-to-sue letter is related to the EEOC letter at issue undermines her claim. She has not, therefore, discharged her burden to show that she exhausted her administrative remedies. *See Green v. Union Foundry Co.*, 281 F.3d 1229, 1234 (11th Cir. 2002).

Plaintiff also contends that she has exhausted her administrative remedies under the IDEA, thereby validly bringing her claim before this Court, citing the complaints filed with the ODE. (Doc. 25 at 19). Plaintiff states that the "ODE acknowledged and investigated those complaints pursuant to the dictates of the IDEA, and that they reached a resolution to the complaints." (*Id.*). As referenced above, the IDEA requires plaintiffs to exhaust their administrative remedies before bringing a federal suit.[12] In *Covington v. Knox County School*

---

[12] The IDEA provides: "Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791 et seq.], or other Federal laws protecting the

10

*System,* the Sixth Circuit stated that, under the IDEA, plaintiffs exhaustion of remedies is required in IDEA suits.  205 F.3d 912, 915 (6th Cir. 2000).  The Court clarified that exhaustion under the IDEA is usually, but not always required, particularly in cases where it would be futile or inadequate to protect the plaintiff's rights, or if the plaintiff was not given proper notice of his or her procedural rights under the IDEA.  *Id.* at 917.  The Court in *Horen v. Board of Eduation of City of Toledo Public School District*, found that the IDEA exhaustion requirement "applies equally to a § 504 [RHA] claim."  655 F. Supp. 2d 794, 802-03 (N.D. Ohio 2009) (internal citations omitted).  Furthermore, the *Horen* Court stated that exhaustion of remedies under the IDEA applies to claims of retaliation.  *Id.*

It is undisputed that Plaintiff filed complaints with the ODE, which contributed to the audit and subsequent corrective action taken within the District.  While the ODE complaints and their ultimate resolution provide factual background to Gainor's claim, they do not function in the manner she argues.  They in no way have an effect on the exhaustion of remedies, because they did not occur within the relevant 300-day period following the discipline.  Therefore, Plaintiff's IDEA exhaustion of remedies claim does not impact her claims under the ADA or RHA, but serves instead as part of the factual basis on which her claims are brought.

Unlike the ADA, RHA, and the IDEA, ORC § 4112 does not have an exhaustion of remedies requirement.  *Arnold v. City of Columbus*, No. 2:08-CV-262, 2011 WL 1311892, at *10 (S.D. Ohio Mar. 31, 2011) (citing *Harrison v. City of Akron,* 43 F. App'x 903, 905 (6th Cir.2002)).  In addition, ORC § 4112 has a six-year statute of limitations for retaliation claims.  *Greenleaf v. DTG Operations, Inc.*, No. 2:09-CV-192, 2011 WL 883022, at *6 (S.D. Ohio Mar.

---

rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter."  20 U.S.C.A. § 1415.  *See also Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 915 (6th Cir. 2000).

11, 2011) (citing *Cosgrove v. Williamsburg of Cincinnati Mgt. Co., Inc.,* 70 Ohio St.3d 281, 638 N.E.2d 991, 992 (Ohio 1994)). Therefore, Plaintiff's state law claim falls within the statute of limitations under Ohio law.

### a. Minority Tolling Statute

In a last ditch effort to save her claim, Plaintiff proffers that the relevant statute of limitations was tolled under Ohio's minority tolling statute. (Doc. 25 at 18-19). Though it is not clearly stated, Plaintiff seems to allege that, even if her retaliation claim is barred by a two-year statute of limitations under the ADA, Ohio's minority tolling statute would make her claim timely brought. There are, however, two critical issues with Plaintiff's claim.

First, Plaintiff improperly applies a two-year statute of limitations to her Title I claim. As noted in Sec. IV(B)(1), *supra*, a Title I claim under the ADA has a 300-day statute of limitations when it is brought before a state or local agency. In assessing the applicability of state law tolling statutes to federal claims, the Sixth Circuit has articulated: "[w]hen the statute of limitations is borrowed from state law, so too are the state's tolling provisions, except when they are 'inconsistent with the federal policy underlying the cause of action under consideration.'" *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 537 (6th Cir. 2010) (quoting *Bd. of Regents v. Tomanio,* 446 U.S. 478, 485 (1980)). Due to the ADA's incorporation of Title VII's statute of limitations, 42 U.S.C. § 2000e-5(e)(1), which set out the 180 day and 300 day statutes of limitation, an application of Ohio's minority tolling statute would be improper.

Second, Plaintiff misapplies the tolling statute to her claim. Under Ohio's minority tolling statute, when "the minor plaintiff's claims are joint and inseparable with the claims of other parties, they too can benefit from his disability and bring their claims within the statutory

period after his disability ends." *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 537 (6th Cir. 2010). Courts have recognized a third-party's claims under minority tolling, but the claims must be joint and inseparable from the claims of the disabled party. *Id*. at 538 (quoting *Fehrenbach v. O'Malley,* 164 Ohio App.3d 80, 841 N.E.2d 350, 366 (2005)). Plaintiff states that her claims are inseparable from her son's, because he was not 18 years old at the time this action was brought, thereby allowing her to benefit from a tolled statute of limitations. Gainor's minor son has never been a party to this action. Minority tolling is, therefore, inapplicable to this case.

Because Plaintiff has failed to demonstrate that she met the exhaustion of remedies required under the ADA and the RHA, Defendant's Motion for Summary Judgment on Count II is **GRANTED**.

### 2. *McDonnell Douglas* Framework

Even if Plaintiff had properly exhausted the administrative remedies under the ADA and RHA, her retaliation claim would still fail. Plaintiff alleges that Defendants' retaliated against her based on advocacy on her behalf, and her son's behalf, thereby violating her rights under the ADA, § 12101 *et seq*., the RHA, 29 U.S.C. § 701 *et seq.*, the IDEA, 20 U.S.C. § 1400, O.R.C. § 4112 "and other Ohio and Federal common and statutory law." Based on the facts, it is clear that Plaintiff does not meet the *prima facie* case for retaliation.

The framework applied in reviewing retaliation claims under the RHA and the ADA is the familiar *McDonnell Douglas* burden-shifting framework. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (applying *McDonnell Douglas* to RHA retaliation claim); *Barrett v. Lucent Technologies, Inc*., 36 F. App'x 835, 840 (6th Cir. June 6, 2002) ("Retaliation claims are

treated the same whether brought under the ADA or Title VII.") (citing *Penny v. UPS,* 128 F.3d 408, 415 (6th Cir. 1997)).  Under *McDonnell Douglas*, a plaintiff must first make out a *prima facie* case of discrimination.  *Id.* (citing *McDonnell Douglas,* 411 U.S. at 802). If she meets this requirement, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions.  *Id.*  Finally, if the employer sustains this burden, the plaintiff "must point out 'evidence from which a jury could reasonably reject [Defendants'] explanation'" as pretextual. *Davis v. Cintas Corp*., 717 F.3d 476 (6th Cir. 2013) (quoting *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009)).  At the summary judgment stage, the district court must determine whether there is "sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

A *prima facie* case of retaliation under the RHA consists of four elements: "1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this right; 3) the defendant then took an employment action adverse to the plaintiff; and 4) the protected activity and the adverse employment action are causally connected." *Gribcheck*, 245 F.3d at 550 (*Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987) (applying *McDonnell Douglas* to Title VII retaliation claim)).

To state a *prima facie* case of retaliation under the ADA, a plaintiff must show that: "(1) she engaged in protected activity, (2) defendant took an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action." *Barrett*, 36 F. App'x at 841 (citing *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 578 (6th Cir. 2000)).  Notably, a plaintiff need not be actually disabled to assert a claim of disability

retaliation, but rather "must have a reasonable and good faith belief that the opposed act or practice is unlawful under the ADA."  *Id*. at 840 (citing *Johnson*, 215 F.3d at 579-580).

Except for the knowledge component under the RHA, necessary in RHA claims, retaliation claims under the ADA and RHA are, effectively, identical: "The [ADA and RHA] have a similar scope and aim; for purposes of retaliation analysis, cases construing either Act are generally applicable to both."  *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013) (citing *Andrews v. Ohio*, 104 F.3d 803, 806-07 (6th Cir. 1997)); *see also McCormick v. Miami University*, 693 F.3d 654, 663-64 (6th Cir. 2012).  Additionally, "[t]he burden for establishing a retaliation claim under ORC § 4112 is identical to Plaintiff's burden to prove retaliation under the [ADA and RHA]."  *Moorer v. Copley*, 98 F. Supp.2d 838, 845 (N.D. Ohio 2000) (internal citations omitted); *see also Hopkins v. Canton City Bd. Of Educ.*, 477 F. App'x 349, 359-60 (6th Cir. 2012) (quoting *Greer-Burger v. Temesi*, 116 Ohio St. 3d 324, 326-27 (2007)).  Because a retaliation claim under the ADA and the RHA are almost entirely overlapping, they are examined simultaneously below.

The parties agree that Gainor filed complaints with the ODE, a protected activity.  There is also no dispute that Nally was aware of Gainor's ODE filing.  It is the final two elements, regarding possible adverse action and a causal connection between the protected activity and that adverse action, that are in dispute.  To demonstrate an adverse employment action under a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted).  In determining whether certain actions should be considered, "courts look for at least a termination of

employment, a demotion in wage, salary or job title, a loss of benefits, or a decrease in responsibilities." *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 462 (6th Cir. 2002). Defendants allege that there was no adverse action taken against Plaintiff, claiming that her one- and two-day suspensions were reasonable discipline. Plaintiff disagrees, stating that the various disciplines taken against her were unjustified.

Despite the parties' disagreement over whether the action taken was adverse, there is no disagreement as to the material facts relevant to this element. Gainor was disciplined throughout the 2008-2009 school year with two separate suspensions, and a clarification letter. During the 2010-2011 school year, she was not hired for positions for which she applied. The letter did nothing more than clarify certain rules concerning Gainor's employment. Gainor's one- and two-day suspensions were temporary, and though each suspension was without pay, the loss of wages was limited to the short suspension periods. It is undisputed that Gainor was not hired for certain positions for which she applied, but it is also undisputed that Gainor was placed into a different position based on the "bumping rights" provision of the Collective Bargaining Agreement, and that Gainor did not file a grievance upon being placed in her current position.

The letter is not materially adverse to Gainor's employment. Gainor's receipt of the letter did not result in a diminution of pay, title, or benefits, thereby failing to rise to the level of an adverse action. *Id.* Furthermore, the letter was simply a restatement of what had been discussed at the disciplinary meeting, and did not have any material effect on Gainor's employment.

Additionally, Defendants' failure to promote Gainor is also not an adverse employment action. *See Colston v. Cleveland Public Library*, 522 F. App'x 332, 339 (6th Cir. 2013) (failure

to promote is considered an adverse action under Title VII).  When an employee requests a "transfer to a new position within the same employer organization [it] must be analyzed as a 'failure to promote.'"  *Sturgeon v. Southern Ohio Med. Ctr.,* No. 1:10-CV-318, 2011 WL 5878387, at *8 (S.D. Ohio) (citing *Freeman v. Potter,* 200 F. App'x 439, 443 and n. 1 (6th Cir. 2007)).  An employer's decision to deny a lateral transfer, however, "is not an adverse action unless it results in a material change of salary, benefits, responsibilities, or prestige." *Id.* (internal citation omitted).  Here, Plaintiff fails to adduce any evidence that Defendants' failure to promote Gainor was, in fact, an adverse action.  Rather, Gainor was denied lateral transfers, and Plaintiff does not explain any way in which these transfers would have materially changed Plaintiff's salary, benefits, responsibilities, or prestige.

Gainor's suspensions without pay, however, can constitute an adverse employment action.  In certain circumstances, it is undeniable that suspension without pay is an adverse action.  *See Burlington N. v. Santa Fe Ry. Co. v. White*, 548 US.S. 53, 67 (2006) (a 37-day suspension without pay was materially adverse).  Shorter suspensions without pay, while not nearly as severe as those lasting a month or more, have also been found to constitute an adverse action.  *See Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004) (a 24-hour suspension, the equivalent of three eight-hour work days, was an adverse employment action).  Though Gainor's suspensions were two separate, short suspensions, they were without pay, thereby meeting the standard of an adverse action.

Even if Plaintiff's suspensions without pay rises to the level of an adverse action, that alone does not establish a *prima facie* case of retaliation.  Plaintiff still has the burden of showing the causal connection.  Not surprisingly, the causal connection between the alleged adverse action and retaliation lies at the heart of the dispute.  Defendants claim that the facts point to a

lack of causal connection between the ODE filings and any adverse action taken against Plaintiff. Conversely, Plaintiff argues that the facts show the opposite, fully supporting her claim of retaliation.  It is well settled that, "[to] establish a causal connection required in the fourth prong [of the *McDonnell-Douglas* framework], a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action."  *Hicks v. SSP America, Inc.*, 490 F. App'x 781, 785 (6th Cir. 2012) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).  Temporal proximity, though a factor in demonstrating causation, cannot alone establish a causal connection.  *Fuhr v. Hazel Park School Dist.*, 710 F.3d 668, 675 (6th Cir. 2013) (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010).  Contrarily, failure to show temporal proximity is sufficient for a court to find that there is no causal connection between the adverse action and the retaliation.  *Id.* at 676.

The relevant timeline in determining a causal connection starts with the first ODE filing, and spans the 2008-2009 school year.  Gainor filed the relevant ODE complaints in April and November 2008.  On February 12, 2009, three months after the November 2008 ODE complaint, the District conducted its first disciplinary hearing with Gainor, which covered her unexcused exit from work on January 15, 2009, use of the classroom computer for personal matters, and Gainor's professional conduct.  The hearing resulted in a one-day suspension, without pay, in early March 2009.  On February 18, 2009, Gainor filed a harassment complaint with the District, specifically citing retaliation among the reasons for her claim.  The District scheduled another disciplinary hearing for July 6, 2009, which was held in September 2009, regarding Gainor's insubordination and failure to follow work rules and procedures. That hearing resulted in Gainor's two-day unpaid suspension.  In October 2009, Gainor filed a complaint with the OCRC

outlining the relevant, allegedly retaliatory events. Gainor accepted a job transfer for the 2009-2010 school year, but, due to budget cuts, lost that position and was reassigned to the role of intervention specialist in June 2010. Her new job provided the same pay rate, but was six hours per day rather than her previous rate of seven hours per day. In June 2010, November 2010, and March 2011, Gainor applied for other positions, none of which she was offered. None of the facts in the timeline are in dispute.

Defendants argue that Plaintiff has failed to meet her burden of establishing a causal connection, stating that Plaintiff has not shown temporal proximity and has relied on conclusory allegations. Plaintiff claims that Defendants showed a pattern of investigation and discipline regarding Gainor, which, by itself, should establish the causal connection. As this Court has already stated, temporal proximity must be shown for a plaintiff to properly demonstrate a causal connection. Gainor filed her first ODE complaint in April 2008, was hired at WKHS and started work there in August 2008, filed another ODE complaint in November 2008, and was first disciplined in February 2009. The Sixth Circuit has found that a causal connection can be established based on temporal proximity when the adverse employment action takes place within months of the protected activity. *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007); *see also Randolph v. Ohio Dep't of Youth Servs*, 453 F.3d 724, 737 (6th Cir. 2006) (finding termination that occurred six months after filing of workplace sexual assault was causally connected based on temporal proximity). Though the three-month period between the November 2008 ODE complaint and the February 2009 disciplinary hearing may be sufficient to establish temporal proximity, it is not enough, when taken with the facts, to establish a causal connection.

Even if Plaintiffs were able to establish a *prima facie* case of retaliation, the establishment of a *prima facie* case is not the final step in the analysis. Rather, the burden shifts

to the employer to articulate some legitimate, nondiscriminatory reason for its actions.  *See Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802).  Defendant has provided legitimate, nondiscriminatory reasons for both of Plaintiff's suspensions.  For the March 2009 suspension, Defendant cites Plaintiff's various failures at work, ranging from leaving school without notifying her superiors to using the computer for personal use.  Regarding the October 2009 suspension, Defendant cites Plaintiff's failure to follow work rules and insubordination.  Finally, Defendants articulate that Plaintiff was properly considered, alongside other candidates, for the different jobs for which she applied.  Plaintiff does not dispute that.  Additionally, as noted earlier, Plaintiff's job reassignment was done pursuant to the "bumping rights" in Plaintiff's Collective Bargaining Agreement, and Plaintiff did not take any steps to change her job placement.  Accordingly, Defendants have articulated legitimate, nondiscriminatory reasons for its disciplinary actions, thereby meeting their burden.

Once Defendants have met the second *McDonnell Douglas* element, the burden shifts back to the Plaintiff, who "must point out 'evidence from which a jury could reasonably reject [Defendants'] explanation'" as pretextual. *Davis*, 717 F.3d 476 (quoting *Chen*, 580 F.3d at 400). To establish that Defendants' reasons given for the disputed conduct was pretextual, Plaintiff can show that the reasons: "(1) [have] no basis in fact, (2) did not actually motivate the defendants' challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Zeidler*, 516 F.3d at 526.  Furthermore, Plaintiff must provide sufficient evidence on which a jury could reasonably repudiate Defendants' reasons, thereby determining that Defendants, "did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Id*. at 526 (citing *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).  As noted

earlier, Plaintiff lays out her advocacy actions (i.e., filing her complaints with the ODE) and states that the "egregious discipline" of the first suspension was not in relation to Gainor's performance and behavior, but had "everything to do with her advocacy that led to the school being investigated by the ODE." (Doc. 25 at 15). Plaintiff's argument, however, does not address any alleged pretextual basis for Defendants' actions. Plaintiff also fails to provide any evidence from which a jury could find a pretextual reason for Defendants' actions. Plaintiff does not rebut any argument concerning Defendants' legitimate, nondiscriminatory reasons for its actions, thereby failing to prove that Defendants' actions were pretextual.

Based on the foregoing, Defendants' motion is **GRANTED** on Count II, Plaintiff's retaliation claim.

### C. Intentional Infliction of Emotional Distress (Count III)

Count III of Plaintiff's Complaint is a claim of Intentional Infliction of Emotional Distress ("IIED"). As a threshold matter, Defendants argue that they are immune from suit based on political subdivision immunity.

### 1. Political Subdivision Immunity

In *Steinbrink v. Greenon Local Sch. Dist.*, the Second District Court of Appeals held that Ohio school districts are political subdivisions under § 2744.01(F) and so are generally entitled to political-subdivision immunity under § 2744.02(B). *Steinbrink v. Greenon Local Sch. Dist.*, 2012-Ohio-1438 at ¶ 18 (Ohio Ct. App. Mar. 30, 2012). The Court went on to hold, however, that immunity was not available because of R.C. § 2744.09, which exempts from immunity "civil actions by an employee . . . against his political subdivision relative to any matter that arises out of the employment relationship between the employee and the political subdivision." *Id.* at ¶ 25;

*see* R.C. § 2744.09(B).  The Court noted that the Ohio Supreme Court had recently held that "[a]n employee's action against a political subdivision employer arises out of the employment relationship between the employee and the political subdivision within the meaning of R.C. 2744.09(B) if there is a causal connection or a causal relationship between the claims raised by the employee and the employment relationship."  *Steinbrink*, 2012-Ohio-1438 at ¶ 24 (quoting *Sampson v. Cuyahoga Metro. Hous. Auth.*, 966 N.E.2d 247, Syllabus (Ohio 2012)).  The Court went on to find such a causal connection between the plaintiff's employment as a football coach and his claims of defamation, intentional infliction of emotional distress, and tortious interference with contract.  *Id.* at ¶ 25.

Plaintiff similarly brings a civil action against her political-subdivision employer, and there is no dispute that her claim of intentional infliction of emotional distress bears a causal relationship to the employment relationship.  Because the Plaintiff's claim of intentional infliction of emotional distress arises from her employment relation with Defendants, they are not entitled to political-subdivision immunity with respect to that claim.  Defendants cannot, therefore, avail themselves of the defense of political subdivision immunity on Plaintiff's IIED claim.

### 2. Intentional Infliction of Emotional Distress

Looking specifically to the merits of Plaintiff's IIED claim, the Court must consider the elements:  "1) that Defendant either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to Plaintiff; 2) that Defendants' conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; 3)

that Defendants' actions were the proximate cause of Plaintiff's psychic injury; and 4) that the mental anguish suffered by Plaintiff is serious and of a nature that no reasonable person could be expected to endure."  *Paquette v. City of Mason, Ohio*, 250 F. Supp. 2d 840, 846-47 (S.D. Ohio 2002); *see Ekunsumi v. Cincinnati Restoration, Inc.,* 120 Ohio App.3d 557, 698 N.E.2d 503, 506 (1997).[13]  Defendants may be liable only when Plaintiff demonstrates that their conduct was so outrageous that it satisfies the four prongs of an IIED claim.

Plaintiff fails to provide sufficient evidence to demonstrate that she, in fact, suffered emotional distress.  The only evidence Plaintiff cites in support of her claim is the psychological treatment she sought, which, based on her deposition, falls in line with a long history of psychological care.  (*Gainor Dep.*, Doc. 18 at 257-289).  Plaintiff also claims that Defendants "continued to subject her to emotional distress" by continually placing her in Behavior Learning Center positions.  (Doc. 25 at 19).  Finally, she argues Defendants intentionally acted through unwarranted disciplinary procedures.  (*Id.*).  Plaintiff does not provide any additional evidence on which she bases her emotional distress claim.  Mere psychological counseling, tangential to Plaintiff's instant claim, internal transfer, and discipline, are not *ipso facto* sufficient to support an IIED claim.  Even viewing the evidence in the light most favorable to Plaintiff, it is clear that she has failed to establish a claim for IIED.  Therefore, Defendants prevail on this claim.

### 3. Paliotto's Liability

Defendants argue that Paliotto is granted immunity under Ohio Rev.Code Ann. § 2744.03(A)(6)(a) and 2744.03(A)(6)(b).  That section states, in relevant part: "the [political subdivision] employee is immune from liability unless one of the following applies: (a) The

---

[13] *See also Morrow v. Reminger & Reminger Co. LPA*, 183 Ohio App. 3d 40, 61 (2009); *see Moore v. Impact Community Action*, 2013 WL, *4 (Ohio Ct. App. July 23, 2013).

employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." ORC § 2744.03(A)(6)(a), § 2744.03(A)(6)(b).

Looking first at § 2744.03(A)(6)(a), Defendants state that Paliotto's actions were within the scope of her employment and official responsibilities, an argument that is uncontested by Plaintiff. The evidence presented indicates that the various steps taken by Paliotto over the course of Gainor's employment were well within the scope of her employment and official responsibilities. The material facts that speak directly to Paliotto's involvement in the matter are not disputed, further supporting Defendants' request that Paliotto be granted summary judgment (or perhaps, more properly, dismissed on this claim).

Turning to § 2744.03(A)(6)(b), Defendants' allege that Paliotto did not act with malicious purpose, in bad faith, or in a wanton or reckless manner. In opposition, Plaintiff states that Paliotto acted maliciously. "'Malice' is the willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F. Supp. 2d 612, 629 (S.D. Ohio 2004); *see Wright v. City of Canton,* 138 F.Supp.2d 955, 967 n. 8 (N.D.Ohio 2001) (citing *Cook v. City of Cincinnati,* 103 Ohio App.3d 80, 658 N.E.2d 814, 821 (1995)). Plaintiff points to Nally's deposition, drawing attention to his statements that Paliotto directed him to investigate Plaintiff following her ODE filings and relevant IEP meetings. (*Nally Dep.*, at 71-72). Additionally, Plaintiff argues that, because Paliotto was in charge of disciplining Gainor, when it was within her discretion, and could control the degree of discipline, she acted maliciously. (Doc. 24 at 20). Plaintiff's claims are weak, and the facts relevant to this claim are not disputed by either party. Construing the evidence in the light most favorable to the Plaintiff, there is nothing that demonstrates Paliotto's conduct was malicious.

24

Based on the foregoing, Defendants' motion is **GRANTED** on Count III, Plaintiff's claim of Intentional Infliction of Emotional Distress.

## V. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED**.  This case is hereby DISMISSED.

**IT IS SO ORDERED.**

    **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**United States District Court Judge**

**DATED:  December 13, 2013**